## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 9 |
| | : | |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
| | : | |
| Debtor. | : | Hon. Steven W. Rhodes |
| | : | |
| NATIONAL PUBLIC FINANCE | : | |
| GUARANTEE CORPORATION, a New | : | |
| York Corporation, and ASSURED | : | |
| GUARANTY MUNICIPAL CORP., a New | : | |
| York Corporation, | : | Adv. Pro. No. 13-05309 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF DETROIT, MICHIGAN, | : | |
| KEVYN D. ORR, in his official capacity as | : | |
| the EMERGENCY MANAGER, JOHN | : | |
| NAGLICK, in his official capacity as | : | |
| FINANCE DIRECTOR, MICHAEL | : | |
| JAMISON in his official capacity as | : | |
| DEPUTY FINANCE DIRECTOR, and | : | |
| CHERYL JOHNSON, in her official capacity | | |
| as TREASURER, | | |
| | | |
| Defendants. | | |

## REPLY TO PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I. ARGUMENT ..............................................................................................1

   A. There Is No Private Right Of Action Under The Revised Municipal Finance Act .........................................................................................1

   B. Whether Plaintiffs Are Seeking Purely Declaratory Relief Or Something More, § 904 Bars Their Claims ...........................................5

      1. Section 904 Bars Plaintiffs' Claims For Declaratory Relief ......5

      2. Section 904 Would Also Bar Any Order Compelling The City Either To Make Payments To Plaintiffs Or To Cease Paying Other Expenses With Ad Valorem Tax Revenues ....................6

   C. Plaintiffs Do Not Have A Lien On The City's *Ad Valorem* Tax Revenue ....................................................................................................9

      1. Neither The Revised Municipal Finance Act Nor The Bond Resolutions Created A Lien ........................................................9

      2. The *Ad Valorem* Taxes Are Not Restricted Funds ...................13

   D. Plaintiffs Do Not Have A Property Interest In The *Ad Valorem* Tax Revenues, And Their "Conduit" And "Trust" Theories Do Not Create One ...........................................................................................................15

      1. To The Extent That Plaintiffs Seek Special Priority For Their Unsecured Claims, The Bankruptcy Code Preempts State Law ...................................................................................................16

      2. The City Is Not a Mere Conduit ...............................................17

      3. The *Ad Valorem* Tax Revenues Are Not Held in Trust for the Bondholders ............................................................................18

   E. Plaintiffs Are Unable To State A Takings Claim ...............................22

II. CONCLUSION ..........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646 (Bankr. E.D. Mich. 1994) ............6

*City & Cnty. of Dallas Levee Imp. Dist. v. Indus. Props. Corp.*, 89 F.2d 731
    (5th Cir. 1937).................................................................................................18

*In re City of Detroit, Mich.*, No. 13-br-53846, 2013 WL 6834647, -- B.R. --
    (Bankr. E.D. Mich. Dec. 20, 2013).......................................................................8

*In re City of Stockton, Cal.*, 478 B.R. 8 (Bankr. E.D. Cal. 2012)....................6, 7, 14

*Claire-Ann Co. v. Christenson & Christenson, Inc.*, 566 N.W.2d 4 (Mich.
    Ct. App. 1997)................................................................................................3, 4

*In re Cnty. of Orange*, 179 B.R. 195 (Bankr. C.D. Cal. 1995).................................7

*In re Cnty. of Orange*, 191 B.R. 1005 (Bankr. C.D. Cal. 1996).................15, 16, 17

*In re E. Paving Co.*, 293 B.R. 704 (Bankr. E.D. Mich. 2003)..........................18, 19

*Fun 'N Sun RV v. State (In re Certified Question)*, 527 N.W.2d 468 (Mich.
    1994) ............................................................................................................19, 20

*Garden City Educ. Ass'n v. Sch. Dist. of City of Garden City*, 2013 U.S.
    Dist. LEXIS 140353 (E.D. Mich. Sept. 30, 2013)...........................................3, 4

*Goodenough v. Union Guardian Trust Co.*, 267 N.W. 772 (Mich. 1936) ..............21

*Kinder Morgan Mich., L.L.C. v. City of Jackson*, 744 N.W.2d 184 (Mich. Ct.
    App. 2007) ..........................................................................................................11

*Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686 (Mich.
    2010) ...............................................................................................................2, 3

*Lash v. City of Traverse City*, 735 N.W.2d 628 (Mich. 2007) ........................1, 2, 3

*Miller v. Allstate Ins. Co.*, 751 N.W.2d 463 (Mich. 2008).....................................1, 2

*Northern Warehousing Inc. v. State*, 2006 Mich. App. LEXIS 2595 (Mich.
    Ct. App. Aug. 22, 2006)...................................................................................3, 4

*In re Omegas Group*, 16 F.3d 1443 (6th Cir. 1994) ................................................16

*Perry v. Bankston*, 1997 Mich. App. Lexis 1598 (Mich. Ct. App. 1997) ..............18

*Portage Aluminum Co. v. Kentwood Nat'l Bank*, 307 N.W.2d 761 (Mich. Ct. App. 1981) ........................................................................................................21

*Sawicki v. City of Harper Woods*, 118 N.W.2d 293 (Mich. 1962) .........................21

*In re Treco*, 240 F.3d 148 (2d Cir. 2001) ................................................................22

*In re Valley Health Sys.*, 429 B.R. 692 (Bankr. C.D. Cal. 2010) .............................8

*White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789 (6th Cir. 2004) ..................20

STATUTES

11 U.S.C. § 101 ........................................................................................................13

11 U.S.C. § 105 ..........................................................................................................6

11 U.S.C. § 901 ..........................................................................................................8

11 U.S.C. § 903 ..................................................................................................8, 14, 15

11 U.S.C. § 904 ..................................................................................................5, 6, 7, 8

MCL § 123.1265 .......................................................................................................14

MCL § 141.1152(5) ..................................................................................................14

MCL § 380.1311a .......................................................................................................2

MCL §§ 380.1801-1816 ..............................................................................................2

MCL § 432.201 et seq. ..............................................................................................15

Despite providing nearly 70 pages of text in its Opposition,[1] Plaintiffs National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corp. ("Plaintiffs") provide no valid basis to avoid dismissal of its Amended Complaint. Indeed, as explained below, Plaintiffs' Opposition only highlights that they seek in this proceeding to evade fundamental principles of bankruptcy law. Plaintiffs' Amended Complaint should be dismissed with prejudice.

## I. ARGUMENT

### A. There Is No Private Right Of Action Under The Revised Municipal Finance Act

At the outset, Plaintiffs lack standing to maintain a private action against the City under the Revised Municipal Finance Act ("RMFA"). Plaintiffs argue that "[i]t is well settled that a plaintiff may seek declaratory relief regarding violation of a Michigan statute unless the statute expressly deprives such plaintiff of standing to seek such relief." Opp. at 12 (citing *Miller v. Allstate Ins. Co.*, 751 N.W.2d 463, 468 (Mich. 2008)). But this is misleading. The *Miller* court did not announce a general rule that "allows a party to 'seek enforcement of the statute through a claim for . . . declaratory judgment.'" *Id*. Rather, the court was citing to its prior decision in *Lash v. City of Traverse City*, 735 N.W.2d 628 (Mich. 2007), in which

---

[1] At a hearing on February 10, 2014, counsel for the City erroneously stated that the City's reply brief is limited to 5 pages. Pursuant to this Court's Order Establishing Motion Procedure [Docket No. 283], "[n]otwithstanding LBR 9014-1(e), a reply brief filed by the City shall not exceed 30 pages."

it held that, *with respect to the statute at issue in that case*, the plaintiff could pursue a claim for a declaratory judgment. *Miller*, 751 N.W.2d at 468. Notably, the statute in question in *Lash*—the Residence of Public Employees Act—contains no enforcement mechanism whatsoever. Since the statute is silent as to enforcement, there was no bar to the court's finding of statutory standing to pursue a private claim for declaratory judgment. Here, by contrast, the RMFA establishes a comprehensive enforcement regime, and charges only one entity—the Department of Treasury—with responsibility for administering that regime.

Plaintiffs' reliance on *Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686 (Mich. 2010), is likewise misplaced. The statute at issue required school boards to expel any student who physically assaulted a teacher or other school employee. MCL § 380.1311a. The statute did not specify who was responsible for compelling the school board to comply with this statutory obligation, nor did it prescribe any particular manner in which the statute's requirements were to be enforced. *Id.*[2] That the court found that plaintiffs had statutory standing to sue for a declaratory judgment under a statute that is silent as to its enforcement tells us nothing about whether a plaintiff has statutory standing

---

[2] Part 32 sets forth detailed penalties and enforcement mechanisms applicable to certain sections of the Revised School Code. *See* MCL §§ 380.1801-1816. None applies specifically to § 1311a of the Revised School Code.

to sue under a statute, such as the RMFA, whose enforcement is expressly and solely entrusted to a public agency.

It is for this reason that *Lansing* and *Lash* cannot be read to overrule longstanding Michigan jurisprudence holding that "where a statute creates a new right or imposes a new duty unknown to the common law and provides a comprehensive administrative or other enforcement mechanism or otherwise entrusts the responsibility for upholding the law to a public officer, a private right of action will not be inferred." *Northern Warehousing Inc. v. State*, 2006 Mich. App. LEXIS 2595, at \*4-6 (Mich. Ct. App. Aug. 22, 2006) (quoting *Claire-Ann Co. v. Christenson & Christenson, Inc.*, 566 N.W.2d 4 (Mich. Ct. App. 1997). Moreover, such preclusion of a private right of action does not, as Plaintiffs argue, merely bar claims for money damages. In *Northern Warehousing*, for example, the court found that where the statute created no private right of action, plaintiffs were not entitled to an injunction enforcing the statute. *Id.* at \*15. Similarly, in *Garden City Educ. Ass'n v. Sch. Dist. of City of Garden City*, 2013 U.S. Dist. LEXIS 140353 (E.D. Mich. Sept. 30, 2013), the court found that aggrieved teachers were precluded from obtaining an injunction where the particular section of the Revised School Code they sought to enforce was subject to a "comprehensive . . . enforcement mechanism," including "withholding of state funding" and oversight by the "governor's council on educator effectiveness." *Id*.

3

The courts' decisions in *Claire-Ann*, *Northern Warehousing* and *Garden City* all turned on whether there was a comprehensive enforcement mechanism indicating that the Legislature intended the statute to be enforced by public officials rather than private parties – the very type of mechanism spelled out at length in § 201 of the RMFA. Thus, under the reasoning in *Claire-Ann*, *Northern Warehousing* and *Garden City*, there is no private right of action for any claim – including claims for declaratory judgment – under the sections of the RMFA that Plaintiff seeks to enforce.

Even if it were only claims for injunctive relief that fell within the scope of those cases, Plaintiffs' claims would nonetheless be barred here because— regardless of how artfully Plaintiffs have pled those claims—it is clear that what they seek is functionally an injunction.   Plaintiffs try to skirt the obstacles they face under Michigan law by claiming that they are merely requesting declaratory relief, arguing that it does "not seek to compel any use or disposition of revenues or funds."  Opp. at 18, 65.  If this were true, Plaintiffs would be seeking essentially an advisory opinion, one that confirms Defendants' duties under state law, but does not have any value in compelling action based on those duties.  Such an order would, of course, be of no use to Plaintiffs.  Furthermore, Plaintiffs contradict themselves when they admit that they seek to "bind the Individual Defendants in their official capacities to *ensure compliance by the City* with the dictates of

4

Michigan law and the United States Constitution." Am. Compl.at 25 n.4 (emphasis added). In Plaintiffs' view, this *compliance by the City* requires that the City segregate certain tax revenues, deposit them into accounts specified by Plaintiffs, ensure that they are not commingled with other funds and refrain from using them for any purpose other than paying the bondholders. *See* Am. Compl. Counts I and VI.

Thus, although Plaintiffs disingenuously say that they do not seek to compel payment "at this time," Am. Compl. at 47, n.4, it is undeniable that this is precisely why they brought this lawsuit. Plaintiffs are seeking to compel action by the City. Plaintiffs cannot change the essential nature of their claims by dressing them up as "merely" claims for declaratory judgment.

## B. Whether Plaintiffs Are Seeking Purely Declaratory Relief Or Something More, § 904 Bars Their Claims

### 1. Section 904 Bars Plaintiffs' Claims For Declaratory Relief

Even if Plaintiffs really were seeking nothing but declaratory relief, § 904 bars this Court from exercising jurisdiction over their claims. The text of § 904 is broad and unequivocal: It applies "[n]otwithstanding any power of the court," and bars the Court from entering "any stay, order, or decree" that would interfere with the City's political or governmental powers or with its property or revenues. 11 U.S.C. § 904. This prohibition "is so comprehensive that it can only mean that a

5

federal court can use no tool in its toolkit—no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order—to interfere with a municipality regarding political or governmental powers, [or with its] property or revenues." *In re City of Stockton, Cal.*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012).[3]  As this Court has stated before, § 904 ensures that courts have "only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control." *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).  To the extent that Plaintiffs' claims are unsecured, the declaratory judgment that Plaintiffs seek would require the Court to go much further than § 904 allows.

> **2.  Section 904 Would Also Bar Any Order Compelling The City Either To Make Payments To Plaintiffs Or To Cease Paying Other Expenses With Ad Valorem Tax Revenues**

Even if § 904 did not preclude Plaintiffs' request for declaratory relief, it is inarguable that, at the very least, it bars the Court from entering an order compelling the City to make payments to UTGO bondholders.  Plaintiffs implicitly concede that § 904 would bar an order "compel[ling] any use or disposition of

---

[3]Plaintiffs attempt to dismiss *Stockton* on the grounds that that decision involved only a request for injunctive relief.  Opp. at 65 n.49.  But Plaintiffs notably make no attempt at responding to *Stockton*'s in-depth consideration of § 904, in which the court traced the statute's historical development and reached the conclusion that "the § 904 limitation on the court's authority is absolute."  478 B.R. at 20.

revenues or funds." Opp. at 65. The case law makes this clear: "Coercively preserving a status quo that entails payment of money from the City treasury interferes with the City's choice to suspend such payments." *In re City of Stockton, Cal.*, 478 B.R. 8, 21 (Bankr. E.D. Cal. 2012); *see also, e.g., In re Cnty. of Orange*, 179 B.R. 195, 200 (Bankr. C.D. Cal. 1995) (order requiring County to pay professionals on an interim basis "would constitute interference with 'the property or revenues of the debtor.'"). This is true regardless of Plaintiffs' flawed argument that the pertinent tax proceeds are property of the bondholders and not of the City, for those proceeds are certainly the City's "revenues" under § 904's protection of "any of the property or revenues of the debtor." *See, e.g., Stockton*, 478 B.R. at 21 ("The contents of the City treasury are 'property or revenues' within the meaning of § 904(2).").

Because even Plaintiffs apparently recognize that an order *compelling* payments is out of the question, their hope seems to be that an order in its favor would effectively *prohibit* the City from using the proceeds of the extra millage with respect to the UTGO bonds to pay any other expenses. But an order interfering with the City's operations by putting its revenues in limbo would violate § 904 just as much as an order requiring the City to spend those revenues (whether to pay these bondholders or otherwise). In either case, the Court would be telling the City how to manage its finances. This would contravene § 904's

7

unequivocal rule that "a debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property." *In re Valley Health Sys.*, 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010); *see also* 11 U.S.C. § 901 (excluding § 363 from incorporation into Chapter 9). Plaintiffs' complaint is thus no mere request for clarification of rights, but an impermissible attempt to sidestep § 904.

Plaintiffs' inability to direct the City in its use of its property or revenue does not mean that that use could not have any collateral consequences. Most obviously, and as the Court has discussed, it is possible that, if the City chooses not to pay the tax revenues at issue to Plaintiffs—that is, if the City continues to treat Plaintiffs' unsecured claims like those of every other unsecured creditor, consistent with the Bankruptcy Code—some may argue that it should, under Michigan law, lose the authority to collect the extra millage that its residents authorized under RMFA § 701 and the Unlimited Tax Election Act with respect to the UTGO bonds. But that issue is not Plaintiffs' to dictate. Rather, the policy of Chapter 9 is to ensure that "state officials remain fully politically accountable to the citizens of the state and municipality." *In re City of Detroit, Mich.*, No. 13-br-53846, 2013 WL 6834647, -- B.R. -- (Bankr. E.D. Mich. Dec. 20, 2013); *see generally* 11 U.S.C. § 903 (confirming that nothing in Chapter 9 "limit[s] or impair[s] the power of a State to control, by legislation or otherwise, a municipality of or in such State in

8

the exercise of the political or governmental powers of such municipality"). It is certainly not an issue presented to the Court by Plaintiffs' complaint nor appropriate for decision in this adversary proceeding.

### C. Plaintiffs Do Not Have A Lien On The City's *Ad Valorem* Tax Revenue

#### 1. Neither The Revised Municipal Finance Act Nor The Bond Resolutions Created A Lien

Relying primarily on their own allegations, Plaintiffs argue that their claims are secured by a lien on tax revenue. Their main argument is the assertion that the UTGO bonds are "double-barreled," which purportedly makes them "secured" under the bond resolutions and Michigan law. *See* Opp. at 34 *et seq.* But this is unfounded. Whether supported by the City's full faith and credit, an undertaking to pay the bonds from *ad valorem* taxes, or both, the result is the same — the pledge set out in the bond resolutions amounts only to an unsecured promise to pay the bonds, either from general revenue or *ad valorem* taxes.

Plaintiffs do not seriously dispute that nothing in any Michigan statute or the resolutions grants them an express lien in the tax revenues. Plaintiffs argue instead that the *ad valorem* tax revenues are levied solely for the benefit of the bondholders, and therefore, express language in the bond resolutions granting a lien, or establishing priority, is not needed. Opp. at 36-37. This argument cannot be correct. *All* of the bonds the City has issued are supported by the City's taxing

authority, but this does not confer upon all bondholders a lien in the taxes the City ultimately levied. Indeed, the bond resolutions at issue here do not specifically identify any particular tax revenues as collateral to support the bonds, other than to set forth an unlimited tax promise. The resolutions include no cash trap mechanism, for example, and the bondholders are given no recourse against any of the *ad valorem* tax revenue. This is in contrast to the City's secured financings with respect to water and sewer bonds and bonds backed by distributable state aid, where bondholders have express liens in, and clear control over, certain designated revenues.

Plaintiffs attempt to distinguish the example of the $8,700,000 General Obligation Bonds dated as of October 1, 2007 issued by the City of Central Falls, Rhode Island (the "Central Falls Bonds"), which Defendants cited in their main brief. Plaintiffs claim that there is a distinction between the Central Falls Bonds and the bonds here because Central Falls was "merely required to 'appropriate' sufficient funds from its general tax levy to pay the [Central Falls Bonds]." Opp. at 37. In fact, the Official Statement for the Central Falls Bonds provides that, to the extent that the general tax levy is insufficient to pay the city's bond obligations, the amount "shall nevertheless be added to the annual tax levy," and that "all taxable property in the City is subject to ad valorem taxation without limitation as to rate or amount" as needed to provide the needed funds. *See* Opp., Ex. 2. Thus, the

Central Falls Bonds were no different from Plaintiffs' "double barrel" bonds, which the Rhode Island legislature determined were unsecured, making necessary passage of legislation to grant bondholders an express lien.

Plaintiffs repeat their references to the words "security" and "pledge" in the bond resolutions, which they argue create, by collective implication, a lien against the *ad valorem* taxes. Opp. at 41. This, of course, is a point the City dealt with in its opening brief. Although we pointed out there that Section 801 of the resolutions does indeed provide for the discharge of the "lien of this Resolution for the benefit of" the bonds upon the defeasance of the bonds, Section 801 is the only provision of either the resolutions or any relevant Michigan statute that uses the word "lien" at all. *See* MTD at 32. As was also stated before, Section 801 is in no way a granting clause and has no operative effect for purposes of granting the Bondholders a security interest.

Plaintiffs cite *Kinder Morgan Mich., L.L.C. v. City of Jackson*, 744 N.W.2d 184, 191 (Mich. Ct. App. 2007), for the proposition that the phrase "pledge" means "the act of providing 'security for the repayment of debt.'" Opp. at 43. But the cited passage from the case is dicta, and the *Kinder Morgan* court was not interpreting the statutes or resolutions at issue here.

Plaintiffs focus as well upon the use of the words "pledge" and "security" in the resolutions. However, those terms have multiple meanings, and in the absence

of a legal granting clause, the use of these words alone does not rise to the level of granting a security interest. In fact, if the word "pledge" did automatically mean "security interest" or "lien," without the need for the technically and legally required granting clause, then every bond issued by the City would be secured in one revenue source or another, including the City's other general obligation bonds, which are backed by a "pledge" in the City's full faith and credit. This cannot be the correct result, nor would such an outcome be consistent with Plaintiffs' "double barrel" argument, whereby it seeks to differentiate these UTGO bonds from the City's other bonds. Opp. at 40.

Plaintiffs further assert that the "statutes pursuant to which the Resolutions were issued make clear that the word 'pledge' was intended to … provide security for payment of the [Bonds] through a pledge of the special *ad valorem* taxes" and that Act 189, in particular, "unequivocally and unambiguously" makes this clear. Opp. at 42. No such clarity exists under the law. Act 189, as cited by Plaintiffs, provides that an "Unlimited Tax Pledge" means "*an undertaking*" to "secure and pay a tax obligation from *ad valorem* taxes ...." The Unlimited Tax Pledge, therefore, is not the grant of a lien.

Plaintiffs have no "charge against" any property of the City to secure payment of the UTGO bonds. They have no possession of, or control over, the *ad valorem* taxes and have no recourse in respect thereof. Plaintiffs have nothing

12

more than promises of the City to pay, which, like other pre-bankruptcy promises, become general unsecured claims in the chapter 9 case.

For all of these reasons, Plaintiffs' attempts to create a definitional statutory lien cannot be credited. The relationship between the parties is contractual, and thus cannot give rise to a statutory lien pursuant to § 101(53) of the Bankruptcy Code. For the reasons already stated, the resolutions do not constitute a "security agreement" under § 101(50). Thus, the bondholders do not have a "security interest" in the *ad valorem* taxes pursuant to § 101(51).

### 2. The *Ad Valorem* Taxes Are Not Restricted Funds

Plaintiffs wrongly assert that the City has said that state law restrictions no longer apply after the filing of a bankruptcy case. Opp. at 31. This is untrue. Instead, the City maintains that state laws that conflict with the Bankruptcy Code's distribution scheme are preempted when, as here, they purport to require preferential payment of a prepetition debt. *See* MTD at pp. 17-20.

Plaintiffs cite chapter 9 cases from California for the proposition that state law restrictions on funds are enforceable in a municipal bankruptcy case. Opp. at 31-33. But those cases are inapposite because they address restrictions on the use of already-accumulated special funds. In neither of the California cases cited did the court uphold a state law "restriction" affirmatively requiring – as Plaintiffs seek

13

here – the collection and use of incoming funds in order to pay a preference to unsecured creditors in violation of the priority scheme of the Bankruptcy Code.

Plaintiffs' assertion that the City has taken inconsistent positions during this case is also mistaken. Opp. at 28. The issue arose in connection with the City's transactions with a public lighting authority (the "PLA"). *See* MCL § 123.1265. Creditors objected because the PLA's operations were funded by the PLA's annual receipt of $12.5 million in utility tax revenue from the City. MCL § 141.1152(5). Among other things, the City argued that there was no impairment of creditors' rights because the statutory structure of the utility tax meant that creditors would have no claim upon the tax revenues in any event. Opp. at 28.

There is no inconsistency. The utility tax in the PLA matter is dedicated to particular governmental functions and is not available for others. This kind of control over the City is permitted by § 903. That that section permits the State to control the exercise of the City's "political or governmental powers, including expenditures for such exercise" does not mean that a State may pass laws that would interfere with the Bankruptcy Code's distribution scheme. *See In re City of Stockton, Cal.*, 478 B.R. 8, 16 (Bankr. E.D. Cal. 2012) ("A state cannot rely on the § 903 reservation of state power to condition or to qualify, *i.e.* to 'cherry pick,' the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed.... For example, it cannot immunize bond debt held by

14

the state from impairment."); *In re Cnty. of Orange*, 191 B.R. 1005, 1021 (Bankr.

C.D. Cal. 1996) ("Reserving to bankruptcy law the setting of priorities in chapter 9

does not ... conflict with Code § 903 ....").  Section 903 was enacted to assure that

the powers afforded to the Bankruptcy Court under Chapter 9 did not interfere with

powers of States that were preserved to them under the Tenth Amendment.  But

nothing contained in the Tenth Amendment allows States to modify "uniform laws

on the subject of bankruptcies" enacted by the federal government.  U.S. Const,

art. I, § 8.  The two situations are not in conflict.[4]

### D.    Plaintiffs Do Not Have A Property Interest In The *Ad Valorem* Tax Revenues, And Their "Conduit" And "Trust" Theories Do Not Create One

Plaintiffs' Amended Complaint raises the new theory that the City is "a mere

conduit for transferring proceeds of *ad valorem* taxes collected under the

Unlimited Tax Levy from taxpayers to Bondholders," such that it lacks any

property interest in the revenues from those taxes.  Am. Compl. ¶ 77, 101-102.

Plaintiffs' Opposition significantly expands on this by making the further argument

that the City holds the tax revenues in trust for bondholders and, thus, must pay

those revenues to the Bondholders, notwithstanding the City's obligations to other

---

[4] Plaintiffs' argument about restrictions on the City's use of gaming revenue is equally irrelevant.  Opp. at 31.  The Michigan Gaming Control and Revenue Act, MCL § 432.201 *et seq.*, limits the budgetary uses to which certain wagering taxes may applied, but does nothing to conflict with the Bankruptcy Code's priorities for the payment of claims.

creditors. *See, e.g.*, Opp. at 23-31. But both of these state-law-based theories are, at bottom, attempts at rewriting the Bankruptcy Code's priority scheme, and are preempted.

> **1.    To The Extent That Plaintiffs Seek Special Priority For Their Unsecured Claims, The Bankruptcy Code Preempts State Law**

The Bankruptcy Code preempts any state-law-based priorities that Plaintiffs—as unsecured creditors—could invoke. "[W]hile the nature and extent of the debtor's interest are determined by state law[,] 'once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.'" *In re Omegas Group*, 16 F.3d 1443, 1450 (6th Cir. 1994) (citation omitted).[5]

A decision from Orange County's bankruptcy is on point. *In re County of Orange*, 191 B.R. 1005, 1017 (Bankr. C.D. Cal. 1996). There, plaintiffs invoked a California statute to argue that, where trust funds have been commingled with non-trust funds, the result is not that the debtor controls all the funds, but rather that it controls none of them. *Id.* at 1016. The court rejected the argument. It ruled that if state law sought to impress a trust on all assets of the debtor to the extent of the

---

[5] For this same reason, Plaintiffs cannot argue that there is a constructive trust of any sort. The Sixth Circuit clearly stated in *Omegas* that "a creditor's claim of entitlement to a constructive trust is not an 'equitable interest' in the debtor's estate existing prepetition." *Omegas*, 16 F.3d at 1450. Although O*megas* was a chapter 11 case, the analysis is no different in chapter 9.

amount owed to the beneficiary, that state law would conflict with federal bankruptcy law and thus was preempted. Ultimately, "[s]tate trust law must be applied in a manner consistent with federal bankruptcy policy." *Id*. at 1017.

Plaintiffs' trust and conduit theories contravene this bedrock principle. Plaintiffs seek a declaration that the City must pay the additional millage to the bondholders rather than using those revenues for other expenses. But as Defendants have explained, if the City were compelled to levy and collect taxes solely for the benefit of UTGO bondholders, it could not use this revenue for other purposes, and the values available to the City or other creditors would be diminished. MTD at 6. To the extent Plaintiffs seek special privileges even if its claims are unsecured, they are attempting to use state law to manipulate and supersede the federal bankruptcy scheme. If Plaintiffs truly are arguing that the Michigan statutory scheme requires that they be entitled to a recovery unavailable to other unsecured creditors, then that scheme is preempted.

### 2. The City Is Not a Mere Conduit

Plaintiffs' conduit theory, too, fails on several levels. Plaintiffs do not dispute that a conduit is an intermediary party who receives a transfer of someone else's monies, but does not gain actual dominion or control over the funds. *See* MTD at 21. Here, the City is the only entity empowered to assess and collect the taxes, and no bondholder could possibly itself assess or collect the taxes Plaintiff

now claims.  The tax revenues, in other words, are not someone else's money; the City could not be cut out of the flow of funds to leave a transaction directly between taxpayers and bondholders.  The City is not merely a conduit, but rather is "endow[ed] [] with public power, and charge[d] [] with [] public dut[ies] and obligation[s]…. [It is] not and cannot be regarded as … [a] mere conduit[] of connections between bondholders and taxpayers."  *City & Cnty. of Dallas Levee Imp. Dist. v. Indus. Props. Corp.*, 89 F.2d 731, 733 (5th Cir. 1937).

### 3.  The *Ad Valorem* Tax Revenues Are Not Held in Trust for the Bondholders

Plaintiffs offer an additional theory that the City merely holds the additional millage revenue in trust for the benefit of the Bondholders. Opp. at 10, 25, 29-31. Like the conduit theory, Plaintiffs' new argument must be rejected.[6]

No trust owns any of the City's property tax revenues.  "Under Michigan law, the creation of a trust depends on intent and the existence of the required elements."  *In re E. Paving Co.*, 293 B.R. 704, 708 (Bankr. E.D. Mich. 2003); *see also, e.g., Perry v. Bankston*, 1997 Mich. App. Lexis 1598, at *6 (Mich. Ct. App. 1997) ("Whether or not a trust was created must depend upon the intention of the [settlor] in providing for the disposition of the [property] in the manner which he instructed and whether the necessary requisites to the creation of a trust were

---

[6] In addition to its other flaws, Plaintiffs' argument also is inconsistent with its assertion that it has a lien on the tax revenues.

observed.") (citation omitted).  The required elements of an express trust are "(1) the existence of a clearly defined res; (2) an unambiguous trust relationship; and (3) specific affirmative duties undertaken by the trustee." *In re E. Paving*, 293 B.R. at 708 (citation omitted).  Here, Plaintiffs fail at least as to the second element, and the authority they cite fails to support their position.

### (a) There Was No Intent to Create a Trust, Nor Was An Unambiguous Trust Relationship Established

Michigan law is clear: "[a] sufficient declaration of trust is essential to the creation of an express or voluntary trust … It must express the intention to create a trust." *Fun 'N Sun RV v. State (In re Certified Question)*, 527 N.W.2d 468, 479 n.31 (Mich. 1994) (citation omitted).[7]  Here, the City never manifested an intention to establish a trust for the benefit of the UTGO bondholders.  Although Michigan law regulates in detail how municipalities should handle tax revenues in repaying bonds, Plaintiffs can point to no provision of Michigan law that unmistakably indicates an intent to establish a trust in favor of the bondholders.  This silence is

---

[7] Indeed, the 1982 State of Michigan Attorney General Opinion cited to by Plaintiff's Opposition only bolsters the argument that, while the levy, treatment, and use of *ad valorem* taxes is indeed highly regulated and controlled, it has absolutely nothing to do with a trust.  Rather than establishing that taxes are held in a trust fund for the benefit of bondholders, the opinion clarifies that, in large part, the purpose of this regulatory structure is to protect taxpayers.  Nowhere does the opinion—or for that matter, the Municipal Finance Act, upon which the opinion is based—suggest that the legislature intended the creation of a trust.

particularly telling since other provisions of the RMFA, not at issue here, explicitly *do* indicate the legislature's intention to create trusts if, when, and where it wanted them. Section 518, for instance, addresses the issuance of a municipal security to pay the costs of unfunded accrued health care liability. In contrast to the sections governing the Bonds, it explicitly provides that the proceeds of such a security "shall be deposited in *a health care trust fund*, *a trust created by the issuer which has as its beneficiary a health care trust fund*, or, for a county, city, village, or township, *a restricted fund within a trust*." RMFA § 518(6) (emphasis added). That same section goes on to detail the requirements that a trust created under that section must comply with, including reports on its financial condition and tax-exempt status. *Id.*

Thus, if the Legislature had intended the Debt Retirement Funds to be trusts, it knew how to make this clear. *Cf. White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789 (6th Cir. 2004) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citation omitted). The fact that the Legislature chose not to do so here confirms that there is no trust in the tax revenues at issue.

Nor do provisions that purport to limit the City's use of funds to a particular purpose give rise to a trust. "The fact that the money deposited in the account was

intended to be used for a specific purpose … does not make it a trust fund … ."

*Portage Aluminum Co. v. Kentwood Nat'l Bank*, 307 N.W.2d 761, 764 (Mich. Ct.

App. 1981); *see also Goodenough v. Union Guardian Trust Co.*, 267 N.W. 772,

774 (Mich. 1936) (same).  In the absence of an expressed intent to create a trust, no

trust exists.

### (b)    Plaintiffs Mistakenly Rely On The *Dissent* In The Michigan Supreme Court Case They Cite In Support Of Their Trust Theory

Notably, Plaintiffs are unable to point to a single controlling opinion from a

Michigan court that supports their theory that the City collects and holds the

additional millage as trustee for the benefit of the bondholders.  Plaintiff cites only

one decision, *Sawicki v. City of Harper Woods*, 118 N.W.2d 293 (Mich. 1962), that

even involved a discussion of tax proceeds used to finance debt service on bonds.

But what Plaintiffs fail to note is that the language and reasoning they relies on

from *Sawicki* comes from Chief Justice Carr's ***dissenting*** opinion.  Justice Souris's

opinion for the majority relied on the plain language of the pertinent statute—and

not any notion of trusts—in determining that the record was unclear as to whether

the plaintiff taxpayers were entitled to a refund of excessive assessments.

Moreover, even if the trust theory had carried the day in *Sawicki*, that decision has

never been cited in the 50 years since its publication, except for one historical

reference in a subsequent proceeding in the same case.

## E.  Plaintiffs Are Unable To State A Takings Claim

Finally, Plaintiffs' takings claim must be dismissed.  Plaintiffs' primary

contention is that it has a security interest or lien in the *ad valorem* tax revenues,

which is protected by the Takings Clause.  Opp. at 61.  Defendants have

acknowledged that, if Plaintiffs had a security interest or lien (which, as explained

above and in our opening brief, it does not), they might have a basis for bringing a

takings claim.  *See* MTD at 37-38.

But Plaintiffs in their Opposition go a step further, contending that they can

state a viable takings claim, even if their claims in bankruptcy are unsecured, so

long as their unsecured interests amount to "property interests."  Opp. at 61-62.

Plaintiff is wrong and fundamentally misunderstands bankruptcy to contend that

the Takings Clause protects such interests in bankruptcy.  By definition, "[i]f the

claim is unsecured, it is not 'property' for purposes of the Takings Clause."  *In re*

*Treco*, 240 F.3d 148, 161 (2d Cir. 2001).

Unsurprisingly, Plaintiff cites no case recognizing the possibility of a takings

claim in bankruptcy involving an unsecured claim.  And for good reason:  To the

extent that a claim is unsecured, it is merely an expectancy in the debtor's having

funds necessary to pay that claim.  And in an ongoing bankruptcy proceeding, this

expectancy is entirely conditional, since the unsecured claim can be compromised,

with the correlative effect of compromising the creditor's interest in repayment.

There is no "property" interest that can be separated from the amount of the unsecured claim, which remains subject to compromise pursuant to the Bankruptcy Code. And this means that no takings claim arises when an unsecured creditor's interest is diminished or eliminated as part of the debtor's process of compromising unsecured claims.

## II.    CONCLUSION

For the foregoing reasons, Defendants submit that the Amended Complaint should be dismissed with prejudice.


Dated:  February 17, 2014                      Respectfully submitted,

                                                /s/ Deborah Kovsky-Apap
                                               Robert S. Hertzberg (P30261)
                                               Deborah Kovsky-Apap (P68258)
                                               PEPPER HAMILTON LLP
                                               4000 Town Center
                                               Southfield, Michigan 48075
                                               Telephone:  (248) 359-7300
                                               Facsimile:  (248) 359-7700
                                               hertzbergr@pepperlaw.com
                                               kovskyd@pepperlaw.com

                                               ATTORNEYS FOR THE DEFENDANTS

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 9 |
|  | : |  |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
|  | : |  |
| Debtor. | : | Hon. Steven W. Rhodes |

|  |  |  |
|---|---|---|
|  | : |  |
| NATIONAL PUBLIC FINANCE | : |  |
| GUARANTEE CORPORATION, a New | : |  |
| York Corporation, and ASSURED | : |  |
| GUARANTY MUNICIPAL CORP., a New | : |  |
| York Corporation, | : | Adv. Pro. No. 13-05309 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| THE CITY OF DETROIT, MICHIGAN, | : |  |
| KEVYN D. ORR, in his official capacity as | : |  |
| the EMERGENCY MANAGER, JOHN | : |  |
| NAGLICK, in his official capacity as | : |  |
| FINANCE DIRECTOR, MICHAEL | : |  |
| JAMISON in his official capacity as | : |  |
| DEPUTY FINANCE DIRECTOR, and | : |  |
| CHERYL JOHNSON, in her official capacity | : |  |
| as TREASURER, | : |  |
|  | : |  |
| Defendants. | : |  |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2014, I caused the foregoing Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss to be electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel registered to receive notice in this adversary proceeding.

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center
Southfield, Michigan 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE DEFENDANTS